IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DARVETTE SMITH, NATALIE HODOROVYCH, ERIN BOX, and BLAKE BREZINSKY, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FAMILY VIDEO MOVIE CLUB, INC.,<br><br>Defendant. | Case No. 11 C 1773<br><br>Judge John Z. Lee<br><br>Magistrate Judge Jeffrey Cole |

## MEMORANDUM OPINION AND ORDER

Defendant Family Video Movie Club, Inc. ("Defendant") moves to decertify Plaintiffs Darvette Smith, Natalie Hodorovych, Eric Box, and Blake Brezinsky's conditionally certified collective action brought under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"). In response, Plaintiffs seek to narrow their FLSA collective action to three subclasses, each addressing a distinct claim, namely that: (1) Defendant excluded employees' commissions from their base rates of pay for purposes of calculating overtime rates; (2) Defendant required employees to run deposits to the bank off-the-clock; and (3) Defendant's anti-overtime and payroll policies resulted in a *de facto* policy requiring employees to perform various tasks off-the-clock.

Plaintiffs submit a trial plan seeking to proceed only on these three claims[1] and propose bifurcating liability and damages. Defendant argues that Plaintiffs' trial plan is infeasible and

---

[1] Plaintiffs abandon their claim for pay relating to "Special Assignments." Pls.' Resp. 13 n.4. Defendant's briefing addressing this claim is moot.

bifurcation improper. For the reasons provided herein, the Court grants in part and denies in part Defendant's motion.

## Background

Defendant Family Video Movie Club, Inc. is a video rental chain with 765 stores operating in 19 states. Def.'s Mem. Supp. Mot. Decert. 1. Defendant's stores are managed by supervisory personnel with various titles, among them, Assistant Manager, Manager In Training, and Store Manager. *Id.* at 1–2. In Illinois, Defendant operates 115 stores and employs 4,654 hourly employees. *See* April 15, 2013, Mem. Dec. and Ord. 1. The Court's previous Order denying Rule 23 class certification of Plaintiffs' claims under the Illinois Minimum Wage Law ("IMWL") provides additional background, including information on the representative Plaintiffs. *See id.* 2–3. The Court will presume familiarity with its April 15, 2013, Order here.

In addition to the IMWL claims, Plaintiffs assert claims under the FLSA. Plaintiffs allege that Defendant violated the FLSA by failing to include commissions in the base rates of pay of employees when calculating overtime rates. *See* Pls.' Am. Compl. ¶ 38. Plaintiffs further allege that Defendant violated the FLSA through its training guide that required employees to run deposits to the bank off-the-clock. *See id.* Plaintiffs lastly allege that Defendant's anti-overtime and payroll policies created a *de facto* work policy requiring employees to perform other off-the-clock tasks, including assisting customers, cleaning and maintaining stores, making phone calls for work-related matters, taking inventory, stocking shelves, balancing the cash register, and running errands. *See id.*

On February 22, 2012, the Court conditionally certified Plaintiffs' FLSA collective action. *See* February 22, 2012, Ord. In April 2012 Plaintiffs sent opt-in notices to Defendant's employees in accordance with procedures under the FLSA for collective actions. Pls.' Resp.

Def.'s Mot. Decert. 2. The parties proceeded to discovery, and 828 Family Video employees opted in to the collective action. The parties then proposed dueling discovery plans, and the Court ordered each party to select 83 opt-ins to participate in written discovery and 42 opt-ins to provide depositions. *See* September 27, 2012 Ord. With discovery complete, Defendant now moves to decertify Plaintiffs' FLSA collective action. Plaintiffs oppose decertification and urge continued certification of three proposed subclasses under the FLSA.

Plaintiffs' first proposed subclass comprises those employees who did not have their commissions included in their base rate of pay before the calculation of overtime rates. Plaintiffs define this first subclass as: "All opt-in Plaintiffs who have more than 40 hours of work in a workweek without receiving applicable overtime premiums that included commission pay from March 14, 2008 through March 14, 2011." Pls.' Resp. Def.'s Mot. Decert. 5. Plaintiffs' second proposed subclass comprises those employees who ran bank deposits off-the-clock. Plaintiffs define this second subclass as: "All opt-in Plaintiffs that took Family Video's bank deposits off-the-clock from March 14, 2008 through March 14, 2011." *Id.* 8. Plaintiffs' third proposed subclass comprises employees who performed sundry off-the-clock tasks for Defendant, including assisting customers, taking inventory, clearing cash registers, making work-related phone calls, stocking shelves, and running errands. Plaintiffs define this third subclass as: "All opt-in Plaintiffs who performed work for Family Video in the store, purchased merchandise for the store, or transferred merchandise between Family Video stores while off-the-clock from March 14, 2008 through March 14, 2011." *Id.* 14.

Defendant opposes continued certification, arguing that individual store manager decisions created material variances in the opt-in members' employment situations, that discovery has borne out these variances, and that these variances necessitate individualized

adjudications of liability, which makes proceeding on a collective basis improper. In support, Defendant points out opt-in members who did not experience the alleged violations, and for those who did, Defendant identifies differences in the amount and frequency of off-the-clock work, managerial knowledge of off-the-clock work, and pay rates.

For their part, Plaintiffs argue that proceeding on a collective basis is proper, citing company-wide policies they contend constitute FLSA violations and identifying through discovery a significant number of opt-in members who experienced the alleged violations. Plaintiffs further argue that the individualized variations Defendant identifies do not go to liability but rather damages, which Plaintiffs' trial plan seeks to address by proposing bifurcation of liability and damages.

The Court grants in part and denies in part Defendant's motion to decertify. The Court concludes that Plaintiffs' first and second proposed subclasses constitute "similarly situated" employees under the FLSA. Plaintiff can maintain these two subclasses and proceed to trial on a collective basis. Plaintiffs' third proposed subclass, however, does not satisfy this standard, and the Court will grant Defendant's motion to decertify as to this subclass.

**Legal Standard**

"Under Section 216(b) of the FLSA, employees may bring a collective action on behalf of themselves and other 'similarly situated' employees against employers who violate the Act's minimum wage or overtime provisions." *Smallwood v. Ill. Bell Tel. Co.*, 710 F. Supp. 2d 746, 750 (N.D. Ill. 2010) (quoting 29 U.S.C. § 216(b)). "District courts have considerable discretion in implementing Section 216(b)." *Allen v. City of Chic.*, No. 10 C 3183, 2013 WL 146389, at *2 (N.D. Ill. Jan. 14, 2013). Importantly, "[t]he FLSA does not define the term 'similarly situated,'" *Russell v. Ill. Bell Tele. Co.*, 721 F. Supp. 2d 804, 811 (N.D. Ill. 2010), and "[n]either

the Supreme Court nor the Seventh Circuit has specified a procedure courts must employ to decide certification and notice issues under the FLSA." *Allen*, No. 10 C 3183, 2013 WL 146389, at *2. Notwithstanding this lack of explicit direction, "the majority of courts . . . have adopted a two-step process for determining whether an FLSA lawsuit should proceed as a collective action." *Jirak v. Abbott Labs., Inc.*, 566 F. Supp. 2d 845, 847 (N.D. Ill. 2008) (noting five courts of appeal which have affirmed the use of the two-step approach to FLSA certification cases).[2] Courts in this district routinely employ this two-step process to determine whether FLSA claims should proceed as a collective action. *See, e.g., Rottman v. Old Second Bancorp, Inc.*, 735 F. Supp. 2d 988, 990 (N.D. Ill. 2010) ("[C]ourts in this district and around the country have settled on a two-step procedure for dealing with collective actions under the FLSA.") (internal citations omitted).

As part of the first step, a court decides whether to conditionally certify a collective action. In so doing, a court evaluates whether the plaintiff can demonstrate that there are similarly situated employees who may also be claimants. If a plaintiff can show that similarly-situated individuals exist, a court will grant conditional approval of the collective action and will allow notice of the case to be sent to the similarly situated employees, who have the opportunity to opt in as plaintiffs. *See Heckler v. DK Funding, LLC*, 502 F. Supp. 2d 777, 779 (N.D. Ill. 2007). The standards for conditional approval are "lenient," *Jirak*, 566 F. Supp. 2d at 848, and require only "a modest factual showing sufficient to demonstrate that [plaintiff] and potential class members were victims of a common policy or plan that violated the law." *Russell*, 575 F.Supp.2d at 933 (quoting *Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042, 1045 (N.D. Ill. 2003)). "Since the 'similarly situated' standard is a liberal one, it 'typically results in conditional

---

[2] The Seventh Circuit has tacitly approved of this two-step procedure. *See Ervin v. OS Rest. Servs., Inc.*, 632 F.3d 971, 973 (7th Cir. 2011) (affirming district court ruling wherein district court employed the two-step conditional certification mechanism).

certification of a representative class.'" *Rottman*, 735 F. Supp. 2d at 990 (quoting *Cameron–Grant v. Maxim Healthcare Serv., Inc.*, 347 F.3d 1240, 1243 n.2 (11th Cir. 2003)).

As part of the second step, a court reevaluates the appropriateness of certification after members of the collective action have opted in and the parties have conducted discovery. "Once it is known which employees will be part of the class, the Court must reevaluate the conditional certification to determine whether there is sufficient similarity between the named and opt-in plaintiffs to allow the matter to proceed to trial on a collective basis." *Id.* During this reevaluation a "[d]efendant may then move to decertify the class or divide the class into subclasses." *Smallwood*, 710 F. Supp. 2d at 753. "The Court must consider: (1) whether the plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff; and (3) fairness and procedural concerns." *Franks v. MKM Oil, Inc.*, No. 10-cv-00013, 2012 WL 3903782, at *10 (N.D. Ill. Sept. 7, 2012). "These factors help a court determine whether it can manage the case and bring about a fair and reasonably expeditious resolution of the collective action." *Russell*, 721 F. Supp. 2d at 811.

Notably, "[c]ollective actions under the FLSA are different than class actions authorized by Federal Rule of Civil Procedure 23, because in FLSA cases the plaintiff is given notice and an opportunity to *opt in,* rather than notice and an opportunity to *opt out.*" *Jirak*, 566 F. Supp. 2d at 847 (emphasis in original). Despite this difference, the Seventh Circuit has held FLSA collective actions and Rule 23 class actions can coexist in a single lawsuit. *Ervin*, 632 F.3d at 974 ("Nothing in the text of the FLSA or the procedures established by the statute suggests either that the FLSA was intended generally to oust other ordinary procedures used in federal court or that class actions in particular could not be combined with an FLSA proceeding."). This coexistence

has led the Seventh Circuit to recognize the similarly between Rule 23 and Section 216(b) analyses. *See Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013).[3] Consequently, while analyzing decertification under FLSA precedent, the Court can look to Rule 23 for additional guidance.

## Analysis

### I. Failure to Include Commissions in Overtime Calculations

Plaintiffs first seek to proceed as a collective action on their claim that Defendant under-calculated overtime pay rates by failing to include the commissions employees earned for the sale of promotional items in their base rates of pay. *See* Pls.' Resp. Def.'s Mot. Decert. 3–6. Defendant argues that proceeding as a collective action on this claim is improper because rate of pay can only be determined on an individualized basis and discovery yields examples of opt-in collective members who were overcompensated rather than under-compensated. Plaintiffs respond that Defendant calculated overtime rates of pay uniformly across all stores, commissions were linked to individual employee payroll numbers, and payroll evidence can establish a common failure to include commissions in base rates of pay. The Court finds the opt-in members are similarly situated to Plaintiffs with regard to claims of under-calculation of overtime rates.

---

[3] Defendant believes *Espenscheid* made Rule 23 class certification standards the analytic architecture for analyzing collective actions under Section 216(b) of the FLSA in the Seventh Circuit. The Court does not read *Espenscheid* so broadly. Defendant seizes on the Seventh Circuit's comment that "there isn't a good reason to have different standards for the certification of the two types of action, and the case law has largely merged the standards, though with some terminological differences." *Espenscheid*, 705 F.3d at 772. But it does not follow from this that a court must follow wholesale the Rule 23 framework in analyzing FLSA actions. Other courts in this district have interpreted *Espenscheid*'s factual posture as distinct. *See Johnson v. Pinstripes, Inc.*, No. 12 C 1018, 2013 WL 5408657, at *7 n.4 (N.D. Ill. Sept. 26, 2013) (noting that in *Espenscheid* the Seventh Circuit recognized that the differences between class actions and collective actions did not bear on the outcome in the case). Courts in other districts have noted that performing Section 216(b) analysis with Rule 23 standards lacks support in most circuits. *See Lillehagen v. Alorica, Inc.*, No. SACV 13-0092-DOC, 2014 WL 2009031, at *7 n.3 (C.D. Cal. May 15, 2014).

During the period of time covered by Plaintiffs' proposed subclass, Defendant calculated overtime rates for its hourly employees using a common formula applied to all Family Video employees. *See* Pls.' Ex., Georg Decl., Ex. 2 Robinson Dep. 58:16–59:8; 79:14–80:1 (overtime calculations were computed using a single formula for all Family Video employees). Defendant also tracked employees' commission sales by individual employee payroll number. *Id.* 57:3–58:5. Ultimately, a single outside payroll department hired by Defendant handled all payroll and overtime calculations based upon computerized transmission of employee payroll data from each Family Video store. *See Id.*, Ex. 1 Nall Dep. 140:15–21.

In support of its motion, Defendant identifies instances of overpayment as well as occasions when employees worked less than 40 hours per week. *See* Def.'s Reply Supp. Mot. Decert. 7 n.7 (overpayment); Def.'s Mem. Supp. Mot. Decert. 21 n.105 (employees working under 40 hours per week). But Defendant's evidence does not establish that the commissions received by employees were treated differently for the purposes of calculating overtime pay. Rather, Defendant shows only that additional factors may have influenced the base rate of pay and correspondingly the amount of the overtime rate of pay. Moreover, Plaintiffs' proposed subclass definition excludes hourly employees not working 40 hours per week. Furthermore, to the extent that employees were overcompensated by offsets or other adjustments, those employees would still be "similarly situated" in the subclass so long as Defendant failed to include their commissions in calculating their base rates of pay.

Defendant cites two cases from the Northern District of California, but both are factually distinct. In *Bryant v. Service Corp. International*, the court declined to certify an employee class under Rule 23 because the company's payroll department did not uniformly track the lump sum payments at issue but required individual employees to write down outside tasks they performed

and manually compute hours and payment for each task. No. C 08-01190 SI, 2011 WL 855815, at *10 (N.D. Cal. Mar. 9, 2011) ("[P]laintiffs will not be able to use the timecard or payroll records to prove a uniform policy."). By contrast, here, Defendant itself tracked commissions for its hourly employees by individual employee payroll number. Moreover, there is no evidence in this case of employees making manual adjustments to commission sales. Defendant's reliance on *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1125 (N.D. Cal. 2011), is similarly misplaced. There, the court declined to certify a class of personal trainers alleging company-wide under-calculation of overtime rates because the time period delineating the proposed class made the proposed class over-inclusive. *Id.* Unlike in *Beauperthuy*, here, Plaintiffs conservatively time-delimit their proposed subclass to correspond with Defendant's change in overtime calculation policy. *See* Pls.' Resp. Def.'s Mot. Decert. 5 n.1 (citing a change in overtime calculation policies in November 2011).

The FLSA requires that commission pay be factored into hourly employees' overtime rates, see 29 C.F.R. § 778.117, and provides a method of calculation by which this is to be done, see 29 C.F.R. § 778.119–120. Given the company-wide formula Defendant's outside payroll department used to calculate hourly employees' overtime rates and the tracking of commission sales by individual employee payroll numbers, liability under the FLSA can be tested on a common, collective basis. All hourly employees had their commissions and overtime rates calculated using the same formula by the outside payroll department, and Plaintiffs have "provided substantial evidence that their claims arise out of a single policy, custom or practice that leads to FLSA violations." *Reed v. Cnty. of Orange*, 266 F.R.D. 446, 450 (C.D. Cal. 2010). The claim that Defendant undercompensated employees by failing to include commissions in

9

their base rates of pay before calculating overtime rates is common to the proposed subclass and capable of fair and efficient collective adjudication.

## II. Running Bank Deposits Off-the-Clock

Plaintiffs' second subclass consists of employees who ran deposits to the bank off-the-clock. To establish similarity, Plaintiffs cite a corporate training policy requiring employees to first clock out before taking the deposits to the bank as well as interrogatory responses, deposition testimony, and declarations from opt-in plaintiffs from which discovery was taken demonstrating that every opt-in member in the sample was required to run bank deposits off-the-clock. In turn, Defendant argues that whether an employee ran bank deposits off-the-clock depends on a number of individualized factors, such as the particular store; the store manager's practices; and at some stores, an informal selection process among the employees after work. Defendant also argues that some employees were credited with time they spent dropping off a deposit while others were not, and the time each employee spent running bank deposits varied based on each store's distance from the bank.

The Court finds Defendant's arguments unpersuasive. First, Defendant had a company-wide Store Training and Reference Guide ("STAR Guide") that instructed employees to first "punch out" and then "take the final deposit directly to the bank." *See* Pls.' Ex., George Decl., Ex. 13 FV(Smith)001225. Indeed, Defendant confirmed that the closing procedure outlined in the STAR Guide was a company-wide procedure. *See id.* Ex. 1 Nall Dep. (121:8–122:13). Additionally, by limiting the class to employees who ran bank deposits off-the-clock before Defendant changed this procedure on May 24, 2011, Plaintiffs have addressed the over-breadth concern that precluded certification of the IMWL class under Rule 23. *See* April 15, 2013 Mem. Dec. and Ord. 10. Time delimitation of the subclass also moots Defendant's argument

10

concerning the availability of a "DEP" deposit code because Defendant adopted this procedure on May 14, 2011, after the bank deposit policy had changed.[4]

With additional discovery, Plaintiffs also have adequately addressed the Court's previous concern that the bank deposit policy was not implemented on a company-wide basis.[5] *See* April 15, 2013 Mem. Dec. and Ord. 11–12. A review of the discovery sample shows that *all* interrogatory respondents indicate that they made bank deposits off-the-clock. *See* George Decl., Ex. 32 (summary of responses). These respondents include the fifty-six randomly selected opt-ins in Plaintiffs' sample and the twenty non-sample opt-in respondents. *See id.* Additionally, four non-sample opt-in declarants were "routinely required" to run bank deposits off-the-clock. *See* Compendium of Opt-in Pls. Decl. Supp. of Opp. to Def.'s Mot. Decert., Exs. 1–4, ¶¶ 3–4. Furthermore, although Defendant suggests that Plaintiffs' sample is not sufficiently representative, thirty-nine opt-in plaintiffs that Defendant itself selected as part of its sample also ran bank deposits off-the-clock.[6] In short, factual development reveals Defendant's company-wide training policy *had* company-wide force.

For its part, Defendant points to facts in the record that indicate individual variations: varying time spent running deposits to the bank; frequency of bank runs; and departures by store

---

[4] Defendant's concern that some opt-in members' claims may be time-barred under the FLSA's three-year statute of limitations also does not justify decertification. The fact that some members may be barred from pursuing their claims here does not overwhelm the common issues affecting the collective nor change the Court's analysis. *See Alvarez v. City of Chic.*, 605 F.3d 445, 449 (7th Cir. 2010) ("If common questions predominate, the plaintiffs may be similarly situated even though the recovery of any given plaintiff may be determined by only a subset of those common questions.").

[5] To the extent that there may have been some employees, who did not make any off-the-clock bank deposits, notwithstanding the existence of the company-wide policy, such circumstances can be fairly addressed as this litigation proceeds. As the Seventh Circuit has explained, a defendant's objection that some class members may not have suffered injury is "an argument not for refusing to certify the class but for certifying it and then entering a judgment that would largely exonerate [Defendant]." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 799 (7th Cir. 2013) *cert. denied*, 134 S. Ct. 1277 (U.S. 2014).

[6] In total, the number of opt-in plaintiffs who provided responses constitutes 15.7% of the entire collective group.

manager from the company-wide policy. Based upon these variations, Defendant raises the specter of unavoidable "[i]ndividual mini-trials." Def.'s Reply Supp. Mot. Decert. 5. But these issues go more to damages than to collective liability. Defendant's "approach would come very close to requiring common proof of damages for class members, which is not required." *Butler*, 727 F.3d at 801 *cert. denied*, 134 S. Ct. 1277 (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 819 (7th Cir. 2012)). Here, there is a "single, central, common issue of liability," *id.*, whether Defendant's company-wide policy requiring hourly employees to run bank deposits off-the-clock violated the FLSA prohibitions. Plaintiffs have provided substantial evidence of a company-wide policy with company-wide force and, therefore, have demonstrated that Plaintiffs and opt-in collective members were "similarly situated" as to this issue. The claim that Defendant required employees to run deposits to the bank off-the-clock is common to the proposed subclass and capable of fair and efficient collective-wide adjudication.

### III. Performing Uncompensated Off-The-Clock Work

Plaintiffs' third subclass consists of employees who performed other uncompensated off-the-clock tasks. Plaintiffs argue continued certification for this subclass is proper because various Family Video anti-overtime and payroll procedures incentivized store managers to require employees to perform tasks off-the-clock. Defendant counters that the facially neutral policies Plaintiffs identify do not rise to FLSA violations and discovery reveals that individual store manager practices varied, defeating any collective determination of liability. In contrast to the other subclass, Plaintiffs have not marshalled substantial evidence demonstrating that opt-in members and Plaintiffs are "similarly situated" as to this issue. In the absence of a company-wide policy requiring employees to perform the alleged off-the-clock tasks, the individual variances prove fatal to continued certification.

12

Whether an employee performed off-the-clock tasks was largely a function of a store manager, even varying between different managers within the same store. *See* April 15, 2013 Mem. Dec. and Ord. 16–17 (citing Horodovych Dep. 14–16, 18, 22). Some store managers were not even aware of off-the-clock work hourly employees performed. *See* Def.'s Mem. Supp. Mot. Decert. 13 n.47. Deposition testimony taken from the discovery sample highlights the manager-level variance. *Compare id.* 9–20 nn. 27, 43, 48, 53, 58, 63, 68, 73, 78, 83, 88, 93, 98 (employees performing specific off-the-clock tasks); *id.* nn. 28, 44, 49, 54, 59, 64, 69, 74, 79, 84, 89, 94, 99 (employees never performing specific off-the-clock tasks). Rather than a company-wide practice, these alleged off-the-clock violations were largely a function of "supervisor-level practices." *Yang v. Kohler Co.*, 488 Fed. Appx. 146, 147 (7th Cir. 2012).

To demonstrate similarity, Plaintiffs identify various management policies as evidence of a company-wide *de facto* policy that permitted off-the-clock work. In particular, Plaintiffs identify: (1) STAR Guide instructions that overtime should be "avoided whenever possible" and be "preapproved" if taken, see Pls.' Ex., George Decl. Ex. 13 FV(Smith)001252; (2) instructions in the Employee Handbook to store managers about running store operations efficiently with minimum staffing, see *id.*, Ex. 11 FV(Smith001040–41); (3) labor forecasting tools and procedures for payroll auditing used to track sales transactions per hour for purposes of staffing adjustments, see *id.*, Ex. 1 (Nall 71:11–72:8); and, (4) written policies allotting employees only thirty minutes to open and close stores, see *id.*, Ex. 30 FV(Smith)000013. Plaintiffs argue that, cumulatively, these policies promoted off-the-clock work at Family Video stores.

But there is nothing facially unlawful about these policies. Businesses often implement measures to control costs and track employee and store data. And a number of the opt-in interrogatory respondents state that they never performed off-the-clock tasks. *See* Pls.' Ex.

13

George Decl. Ex. 32 (noting negative responses). In response, Plaintiffs note that 80% of the discovery sample respondents reported doing off-the-clock work, see *id.* (compendium of discovery sample responses), which constitutes 13% of the collective group. Using these statistics, Plaintiffs analogize their FLSA off-the-clock claim to two other cases — *Ross v. RBS Citizens, N.A.*, 667 F.3d 900, 909 (7th Cir. 2012),[7] where the court certified the class based on declarations from 8% of the hourly employees, and *Teamsters v. United States*, 431 U.S. 324 (1977), cited in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2556 (2011), where 12% of the class members submitted anecdotal evidence of discrimination.

Plaintiffs' analogy, however, is too simplistic. Determining factual similarity for certification purposes is not done "simply by counting noses" but "requires a qualitative assessment too; it is not bean counting." *Butler*, 727 F.3d at 801 (examining *Dukes*). Despite 80% of the discovery sample performing off-the-clock tasks, individual variance driven by store manager discretion suggests that the policies Plaintiffs identify did not promote a *de facto* company-wide policy requiring off-the-clock work. Underscoring this point is Plaintiffs' own argument that establishing Defendant's knowledge of off-the-clock work requires proving that the store managers had knowledge of these events. *See* Pls.' Mem. Opp. Def.'s Mot. Decert. 17–18. To undertake this examination would necessitate an individual inquiry at 115 Family Video stores in Illinois, making continued certification inappropriate.

Plaintiffs have not demonstrated through "substantial evidence" the similarity of opt-in collective members with respect to off-the-clock tasks. The Court grants Defendant's motion to decertify Plaintiffs' third proposed subclass.

---

[7] Plaintiffs' further reliance on *Ross* is questionable as the Supreme Court has vacated the opinion. *See RBS Citizens, N.A. v. Ross*, 133 S. Ct. 1722 (2013).

14

### IV. Presence of Individualized Defenses

Seeking decertification of all three subclasses, Defendant also argues that certain defenses it seeks to raise would require individual adjudication and make certification of the subclasses improper. But Plaintiffs correctly point out that Defendant's affirmative defenses either can be resolved collectively or can be efficiently managed at the damages stage.

First, Defendant contends that determining whether unpaid pre-shift and post-shift work is "preliminary" or "postliminary" and, therefore, non-compensable under the FLSA, entails individualized inquiries. But the commissions claim does not involve preliminary or postliminary activities, and the bank deposits claim can be adjudicated on a collective basis. *See, e.g., IBP, Inc. v. Alvarez,* 546 U.S. 21 (2005) (answering question in context of donning and doffing on a collective basis) *see also Sandifer v. U.S. Steel Corp.*, 678 F.3d 590 (7th Cir. 2012) *cert. granted,* 133 S. Ct. 1240 (U.S. 2013) *and aff'd,* 134 S. Ct. 870 (U.S. 2014) (examining donning and doffing of worker protective gear on a collective basis).

Next, Defendant foreshadows a *de minimis* defense, arguing that Plaintiffs cannot recover for otherwise compensable work time that is insubstantial. *Lindow v. United States*, 738 F.2d 1057, 1062 (9th Cir. 1984); *see also Hawkins v. Securitas Sec. Servs. USA, Inc.,* 280 F.R.D. 388, 397 (N.D. Ill. 2011) (applying *de minimis* defense for work constituting only "a few seconds or minutes each day"). But such a defense does not apply to the commissions claim. For the bank deposit claim, the *de minimis* defense can be manageably adjudicated at trial or in a bifurcated damages proceeding. *See, e.g., Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528, 540–41 (S.D. Tex. 2008) (finding both methods fair and efficient management techniques for handling a *de minimis* defense). This is especially true given Defendant's detailed payroll records.

Defendant also points to a *Klinghoffer Rule* defense. "In what has become commonly known as the *Klinghoffer Rule*, a plaintiff cannot state a claim under the FLSA if he, working less than 40 hours a week, receives payment in excess of what he would have been paid had he worked 40 hours a week at minimum wage." *Sherman v. Premium Concrete Cutting, Inc.*, No. 01 C 7263, 2004 WL 1510030, at*2 (N.D. Ill. July 6, 2004) *modified*, No. 01 C 7263, 2004 WL 2496619 (N.D. Ill. Nov. 2, 2004). Again, Plaintiffs' first proposed subclass explicitly excludes opt-in members working less than 40 hours per week. As to Plaintiffs' second proposed subclass, the Court will impose a similar requirement that this class exclude opt-in members working less than 40 hours per week. *See Streeter v. Sheriff of Cook Cnty.*, 256 F.R.D. 609, 611 (N.D. Ill. 2009) ("A district court has broad discretion to certify a class and may modify a proposed class definition if modification will render the definition adequate.") (class under Rule 23) (citing *Davis v. Hutchins*, 321 F.3d 641, 649 (7th Cir. 2003)); *Alvarez*, 605 F.3d at 449 (noting "[a] district court has wide discretion to manage collective actions" under the FLSA); *see also Walker v. Honghua Am., LLC*, 870 F. Supp. 2d 462, 472 (S.D. Tex. 2012) (noting a district court "has the power to modify an FLSA collective action definition on its own.") (citing *Baldridge v. SBC Commc'ns, Inc.*, 404 F.3d 930, 931–32 (5th Cir. 2005)).

Lastly, Defendant argues that offset defenses for 30-minute uninterrupted meal breaks and holiday pay premiums would present individual questions for analysis. But Defendant advances no evidence of a company-wide policy allowing 30-minute uninterrupted meal breaks. The evidence Defendant does advance of individual 30-minute paid meal breaks, again, can be efficiently managed when computing damages. Similarly, holiday pay premium offsets can be easily calculated given Defendant's payroll records. None of Defendant's defenses individualize the remaining FLSA claims to the point that proceeding as a collective action is improper.

## V. Fairness and Procedural Concerns

Finally, Defendant argues that fairness and procedural concerns require decertification. Defendant contends that the discovery sample is not representative under *Espenscheid* and that damage hearings will be as numerous as the members of the collective. Plaintiffs do not address fairness and procedural concerns in a distinct portion of their briefing but argue elsewhere that random sampling alleviates the concerns of *Espenscheid* and any individual variance in damages can be fairly calculated from payroll records. To analyze fairness "the Court must determine whether it can manage the collective action in a manner that does not cause prejudice to any party." *Khadera v. ABM Indus. Inc.*, No. C08-0417 RSM, 2011 WL 7064235, at *5 (W.D. Wash. Dec. 1, 2011). The Court finds no danger of prejudice or procedural inefficiency if it allows Plaintiffs' first and second proposed subclasses to proceed as a collective action.

The Defendant first relies on its argument that Plaintiffs' sampling method does not satisfy *Espenscheid*. But the procedural history of this case is markedly different from that in *Espenscheid*. Here, after considering the competing discovery plans proposed by the parties, *see* 8/29/2012 Status Report (Joint Discovery Plan), the Court permitted written discovery to be propounded upon 166 of the 828 opt-in members, with Plaintiffs and Defendant each selecting 83 opt-in members. *See* September 27, 2012 Ord. Thereafter, the Court allowed Plaintiff and Defendant each to depose up to 42 opt-in members of their choosing. *See id.* Defendant advances no meaningful argument as to how this process, in which it was allowed to select its own sample of opt-in plaintiffs based upon whatever criteria it elected to apply, was procedurally unfair. The fairness concerns raised by the court in *Espenscheid* are not present here. *Id.* (noting counsel made no attempt to explain in briefing how they constructed their representative sample).

17

Defendant also argues that individual employee variance impinges on fairness because it will result in individual issues of liability and damages. But the Court already has addressed these concerns above. As to the fairness of proceeding collectively with the two proposed subclasses, the Court finds that liability can be determined collectively and any individual variance in damages managed by means of routine calculation. Along these lines, the Seventh Circuit has noted:

> It would drive a stake through the heart of the class action device, in cases in which damages were sought rather than an injunction or a declaratory judgment, to require that every member of the class have identical damages. If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, *the fact that damages are not identical across all class members should not preclude class certification.*

*Butler*, 727 F.3d at 801. It follows that "individualized damage issues and the need for individual testimony and cross examination related to the [FLSA Plaintiffs] will not render the class unmanageable or undermine the objectives of proceeding collectively." *Cottle v. Falcon Holdings Mgmt., LLC*, 892 F. Supp. 2d 1053, 1069–70 (N.D. Ind. 2012). Fairness dictates that manageable individual variance should not prevent Plaintiffs from proceeding collectively under a remedial statute like the FLSA. *Falcon*, 580 F. Supp. 2d at 541 (noting the remedial nature of the FLSA and that Congress intended Section 216(b) to give "plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources") (quoting *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989)). Any remaining variance can be further accommodated through case management procedures, such as creating additional subclasses, bifurcating damages and liability, and decertification or appointment of a special master at the damages stage. *See Butler*, 727 F.3d at 798 (suggesting subclassing and individual or

homogenously-constructed subpopulation hearings on damages); *Espenscheid*, 705 F.3d at 775 (suggesting use of a special master).

### Conclusion

For the reasons herein, the Court grants in part and denies in part Defendant's motion to decertify [327]. The Court allows continued certification of the following subclasses:

All opt-in Plaintiffs who worked more than 40 hours in a workweek without receiving applicable overtime premiums that included commission pay from March 14, 2008, through March 14, 2011; and

All opt-in Plaintiffs who worked more than 40 hours in a workweek that took Family Video's bank deposits off-the-clock from March 14, 2008 through March 14, 2011.

The Court grants Defendant's motion to decertify Plaintiffs' proposed subclass for other off-the-clock work claims.

**SO ORDERED**  **ENTER:**

_____
JOHN Z. LEE
**U.S. District Judge**